UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RON MOWDY, JOAQUAN HARVEY, on behalf of themselves and a class of those similarly situated<br><br>                    Plaintiffs,<br>  v.<br><br>BENETO BULK TRANSPORT, KENAN ADVANTAGE GROUP, INC.,<br><br>                    Defendants.<br>_____/ | No. C 06-05682 MHP<br><br>**MEMORANDUM & ORDER**<br>**Plaintiffs' Motion for Approval of Hoffmann-La Roche Notice** |

On August 15, 2006, plaintiffs Ron Mowdy ("Mowdy") and Joaquan Harvey ("Harvey") filed this putative collective action against defendants KAG West, LLC (formerly Beneto Bulk Transport) ("KAG West") and its parent company Kenan Advantage Group, Inc. ("Kenan") for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.; California Wage Order No. 9-2004 (and its predecessor Wage Orders); California Labor Code sections 200 et seq., 226.7, 201-203, 510 and 1194; and California Business and Professions Code section 17200 et seq. Plaintiffs were formerly employed as drivers by defendants to transport petroleum and related products.

Plaintiffs allege that defendants have maintained a consistent policy or practice of requiring KAG West drivers to work "off the clock" and to work shifts in excess of eight hours per day and totaling greater than forty hours per week without paying overtime compensation in violation of the FLSA and California wage and hour laws. Now before this court is plaintiffs' motion for approval

of Hoffman-La Roche notice and conditional certification of an FLSA opt-in class of all approximately 1,000 current and former employees of defendants in California who have worked as drivers at any time from September 15, 2003[1] to the present for unpaid overtime wages. For the reasons stated, the court rules as follows.

BACKGROUND[2]

Defendants maintain terminals from which they operate tanker trucks to transport bulk petroleum products, the fuel additive ethanol, and non-corrosive petroleum industry chemicals and additives, primarily within the states of California, Nevada, and Arizona. Defendants maintain a total of twenty-four terminals—eight in Northern California, twelve in Southern California, two in Arizona, and two in Nevada. Defendants serve both interstate and intrastate product transportation needs of customers such as Archer-Daniels-Midland, Chevron, Exxon, Shell, and Conoco/76.

Plaintiff Mowdy resides in Contra Costa County and was employed by defendants as a driver at several of defendants' Northern California facilities from July 1992 to January 2007. Plaintiff Harvey is a resident of Los Angeles and was formerly employed by defendants as a driver in Southern California from September 1999 to December 2005. Both Mowdy and Harvey claim to have regularly worked 12-hour shifts six days per week while employed by defendants, and to have been paid a flat hourly wage for all hours worked. Mowdy Dec.; Harvey Dec.

LEGAL STANDARD

Employees may bring a collective action under the FLSA on behalf of similarly situated employees. 29 U.S.C. § 216(b)[3]; see also Leuthold v. Destination America, Inc., 224 F.R.D. 462, 466 (N.D. Cal. 2004) (Walker, J.). The court "may authorize the named FLSA plaintiffs to send notice to all potential plaintiffs and may set a deadline for those potential plaintiffs to join the suit." Id.; see also Hoffmann-La Roche v. Sperling, 493 U.S. 165 (1989) ("Hoffmann-La Roche II"). Potential plaintiffs may file a written consent with the court to opt in to the suit. 29 U.S.C. § 216(b).[4] Potential plaintiffs who do not opt in are not bound by the judgment and may bring a

2

subsequent private action. Leuthold, 224 F.R.D. at 466 (citing EEOC v. Pan Am. World Airways, Inc., 897 F.2d 1499, 1508 n.11 (9th Cir. 1990)).

      The court's determination of whether a collective action is appropriate is discretionary. Leuthold, 224 F.R.D. at 466; see also Lusardi v. Lechner, 855 F.2d 1062, 1074–75 (3rd Cir. 1988). Plaintiffs bear the burden of showing that they and the proposed class are similarly situated for purposes of section 216(b). 29 U.S.C. § 216(b); see also Romero v. Producers Dairy Foods, Inc., 235 F.R.D. 474, 481 (E.D. Cal. 2006). The term "similarly situated" is not defined under the FLSA, and the Ninth Circuit has yet to address the issue. District courts have taken three different approaches in interpreting the term "similarly situated" for purposes of section 216(b): "(1) a two-tiered case-by-case approach, (2) the incorporation of the requirements of Rule 23 of the current Federal Rules of Civil Procedure, or (3) the incorporation of the requirements of the pre-1966 version of Rule 23 for 'spurious' class actions." Id. This court, however, has previously adopted a two-tiered case-by-case approach, which is accepted by the majority of courts. Adams v. Inter-Con Sec. Sys., 242 F.R.D. 530, 536 (N.D. Cal. 2007) (Patel, J.). The touchstone for this determination should be the wisdom articulated by the Supreme Court in Hoffmann-LaRoche II. Noting that the 1947 amendments to the FLSA were intended to prevent persons with no personal interest in the outcome from pursuing private FLSA actions, the Court pointed out that "Congress left intact the 'similarly situated' language for collective actions ....[so that' the [b]road remedial goal of the statute should be enforced to the full extent of its terms." 493 U.S. at 173.

      The first step under the two-tiered approach is characterized by a fairly lenient standard, necessitated by the fact that not all discovery will have been completed at the time of the motion. Leuthold, 224 F.R.D. at 467. The court considers merely whether, "based primarily on the pleadings and any affidavits submitted by the parties," the proposed class should be given notice of the action. Id. In the second step, the party opposing the certification may move to decertify the class once discovery is complete and the case is ready to be tried. Id. If at that stage the court finds that the plaintiffs are not similarly situated, "the court may decertify the class and dismiss opt-in plaintiffs without prejudice." Id. The court addresses only the first tier in this order.

Conditional certification at the first stage of the two-tiered approach requires only that "plaintiffs make substantial allegations that the putative class members were subject to a single illegal policy, plan or decision." Id. at 468; see also Sperling v. Hoffmann-La Roche, Inc., 118 F.R.D. 392, 406 (D.N.J. 1988) ("Hoffmann-La Roche I"). "[P]laintiffs need show only 'that their positions are similar, not identical,' to the positions held by the putative class members." Hoffmann-La Roche I at 405 (quoting Riojas v. Seal Produce, Inc., 82 F.R.D. 613, 616 (D. Tex. 1979)). "[T]he 'similarly situated' showing establishes nothing more than the right of plaintiffs to 'maintain' a collective action. At trial, each individual plaintiff must bear his or her burden of proof . . . ." Id. at 407. The finding at this stage merely provides for "unified trial preparation, prosecution, and defense . . . ." Id. Even under this lenient standard, however, "the plaintiffs must show that there is some factual basis beyond the mere averments in their complaint for the class allegations." West v. Border Foods, Inc., No. 05-2525, 2006 WL 1892527, at *2 (D. Minn. July 10, 2006).

## DISCUSSION

Here, plaintiffs allege that other current and former employees of defendants are similarly situated to themselves. They argue that other drivers of defendants are or were subject to substantially similar job requirements and pay provisions, as well as the same policy or practice of defendants to refuse payment of overtime wages.

Defendants contend that many if not all of its drivers are exempt from the protections of the FLSA either through explicit exclusion by the Act itself based on a motor carriers exemption or based on binding arbitration agreements many drivers voluntarily signed upon employment with defendants. Because of this, defendants argue that putative plaintiffs are not similarly situated, and therefore urge the court to deem collective action an inappropriate vehicle for resolution of what they characterize as individual, factually intensive claims by the named plaintiffs. Defendants also argue that plaintiffs have not established any opt-in interest among putative plaintiffs, and defendants fault plaintiffs' counsel for improperly soliciting plaintiff Harvey and attempting to

solicit other drivers as plaintiffs. Additionally, defendants would have this court strike declarations supporting plaintiffs' motion for failure to fully comply with their disclosure obligations.

In their reply, plaintiffs counter that the court should not consider defendants' exemption arguments here because addressing the arguments would require the court to decide issues on the merits, which is not proper at this first stage of conditional certification. Additionally, they argue that opt-in interest is not a requirement of conditional certification, and even if it were, sixteen individuals have opted-in as of the date of the hearing. Plaintiffs deny engaging in any improper solicitation of the named plaintiffs or any others, and they argue all declarations submitted should be considered in support of the present motion because all appropriate disclosures have been made.

I.  Conditional Certification

Plaintiffs request conditional certification of the present action as a representative collective action under 29 U.S.C. § 216(b) so that notice may be sent to similarly situated potential plaintiffs that may be eligible and interested in opting in to this action. Plaintiffs allege that defendants maintain a single policy or practice of failing to appropriately pay overtime wages to KAG West drivers. Additionally, plaintiffs allege that they and putative class members have substantially similar job requirements and pay provisions—that all drivers for defendants worked approximately six 12-hour shifts per week and were paid a straight hourly wage. Plaintiffs have provided declarations from the named plaintiffs Mowdy and Harvey, as well as from four other former employees.[5] The court has also been presented with deposition testimony of the named plaintiffs taken by defendants.

Plaintiff Mowdy states in his declaration that he was employed by defendants from July 2003 through January 2007 as a truck driver and driver-trainer at the Brisbane, Martinez, and Richmond facilities, where he made pickups and deliveries of petroleum products in Northern California and trained new hires. Mowdy Dec.at ¶2. He states that his schedule consisted of six days on and three days off; that his shifts were generally twelve or more hours in length, and that he was never paid overtime wages despite working more than eight hours per day and more than forty hours per week, but instead paid a flat hourly wage for all hours worked. Id. at ¶3.

Plaintiff Harvey states that he was employed by defendants from sometime in 1999 to December 2005 as a truck driver and driver-trainer at the Long Beach and Southgate facilities, and he describes having had substantially the same job responsibilities as plaintiff Mowdy, but made hauls throughout Southern rather than Northern California. Harvey Dec. at ¶2. He also states that he worked the same six days on, three days off, schedule and was paid the same flat hourly wage for hours worked, similarly receiving no overtime wages. Id. at ¶3.

Defendants have not negated the claim that KAG West generally or uniformly denies overtime compensation to any or all drivers it employs. Rather, defendants rely upon the defense to this practice that most, if not all, employees are exempt from the protections of the FLSA. Defendants have attempted to demonstrate that because some drivers who opt in will be deemed ineligible to sue under the FLSA, it will be necessary for the court to closely scrutinize the individual eligibility of putative class members who opt in to determine whether for any reason they fall under an exemption to the FLSA or have previously signed binding arbitration agreements.

### A.   Motor Carriers Exemption

The FLSA applies to a limited range of employed persons, and many classes of employees are explicitly exempted from the Act. Among these exempted classes are employees of motor carriers engaging in interstate commerce because they are subject to the jurisdiction of the Federal Highway Administration ("FHWA"). See 29 U.S.C. § 213(b)(1) (exempting "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49"); FHWA Notice of Interpretation, 46 Fed. Reg. 37,902 (July 23, 1981) ("If in the regular course of employment a driver is, or could be, called upon to transport a shipment in interstate commerce the driver would be subject to the FHWA's jurisdiction under 49 U.S.C. 304."). Defendants refer to this provision as the Motor Carriers exemption. A driver may fall under the exemption because they (1) actually haul loads out of state at least once in any given four-month period, (2) are reasonably expected to haul loads out of state, or (3) hauled products that are part of the stream of interstate commerce—even if wholly engaged in intrastate driving. FHWA Notice of Interpretation, 46 Fed. Reg. 37,902.

1	Defendants argue that most if not all of KAG West's drivers fall within the "Motor Carriers"
2	exemption for one or more of the three reasons listed above.

3	William Nelson, KAG West's Vice President of its Northern Division for the past 19 years,
4	supplies much of the information relied upon by defendants. Nelson Dec. 1. Nelson states that
5	defendants maintain 24 terminals in California, Arizona, and Nevada and advertise and promote
6	KAG West's ability and availability to make interstate hauls, solicit interstate business, and handle
7	interstate shipments, as well as shipments within California. Id. Defendants' out-of-state hauls are
8	made to Nevada, Arizona, Oregon, Idaho, Washington, Utah, Colorado, New Mexico, Texas,
9	Louisiana, Mississippi, Wisconsin, and Indiana. Id. "A number of [defendants' oil company clients]
10	. . . rely on [defendants] to handle longer trips, out-of-state trips, and overflow work." Id.
11	Defendants have supplied a number of declarations from drivers who indicate they have hauled out
12	of state. See Brown, Hartje, Lewis, Souza, Judge, Reimer, Hernandez, Scholder, Miller, Patel,
13	Aeschbach, Morrison, San Andres, Renner, Lopez, and Basaldua Decs. Based on these facts,
14	defendants argue it is clear that some drivers do drive out-of-state. As for reasonable expectations of
15	out-of-state hauling, Nelson asserts that defendants inform prospective new hires that they "may be
16	asked to haul a product outside the State of California." Id. at 2. Additionally, defendants require
17	each driver have a 'T' endorsement on their driver's license, which permits them to operate triple-
18	tanker trucks when outside of California. Id. And, Nelson states that defendants are "unable to offer
19	any guarantees about the frequency of interstate hauls because those hauls are driven by customer
20	demand," and "[i]f a candidate indicates that he or she would not be willing to make out of state
21	hauls, we pass on that candidate." Id. at 3.

22	Defendants, however, have failed to address whether its drivers all actually drive or have a
23	reasonable expectation that they will be asked to drive out of state at least once in any given four-
24	month period. Nelson states that drivers make a number of trips on any given day, the course of
25	which is determined by customer demand, traffic patterns, and other factors, and that the assignment
26	of these trips is based on "a number of factors, including customer demand and driver familiarity
27	with the route." Id. at 3. Some drivers, he states, are considered "dedicated", which means they
28	"haul product for only one customer." Id. In fact, Nelson states that "[a] number of [defendants'

7

clients] own trucks and employ drivers to deliver product locally." Id. Moreover, even if a driver is asked to haul a load out of state, Nelson acknowledges that the driver may ask "if another driver can make the haul, [and] we try to accommodate that driver as part of being a good place to work." Id. Plaintiffs Mowdy and Harvey both claim never to have driven a load out of state while employed by defendants. Id. Other former drivers claim similarly never to have driven out of state. See Montero Dec. (employed from March 2001 through February 2004 at Southern California Vernon facility); Bran Dec. (employed "for a little more than two years" between 2001 and 2003 at the Long Beach and Vernon facilities); Wilson Dec. (employed between June 29, 2002 to November 2005 at Long Beach and Signal Hill facilities); Drummer Dec. (employed from 2002 through 2004 at Vernon). Moreover, both Harvey and declarant Wilson claim to have forgone other work and sought jobs with KAG West because they believed the company hired drivers to do only local work. Harvey Dec.; Wilson Dec. Therefore, defendants' arguments as to out-of-state driving and reasonable expectations do not sufficiently negate petitioners' claims at this stage of conditional certification. It seems plausible that, as plaintiffs allege, some drivers never expect that they will actually be called upon to make an out-of-state trip, let alone be required to actually make the trip rather than work out a switch with another driver.

Similarly, the court does not have enough information from defendants about the products defendants' drivers haul to know whether all drivers are exempt from the FLSA. It is unclear at this point which drivers haul which types of products at what times. Nelson states that defendants transport automotive fuels (gasoline and diesel), aviation fuels, petroleum lubricants, ethanol, non-corrosive petroleum industry chemicals (MTBE, alcohol, and additives), and racing gasoline and test fuels for a variety of oil companies. Nelson Dec. at 1. Some drivers haul more than one type of product and may or may not deliver the same type of products with any degree of regularity. See, e.g., San Andres, Miller, Basaldua, Hartje, Denny, Pillado, Parr, Scholder, Hernandez, Aeschbach, Homes, Williamson, Janek, Farley, and Judge Decs. Additionally, defendants has not clearly addressed whether any product other than ethanol—which named plaintiff Harvey and at least two of defendants' declarants claim not to have hauled—constitutes a product in interstate commerce. Harvey Dep. at 193:24-195:22; 197:5-6; Reimer and Judge Decs. Nelson indicates that ethanol is a

1  substance added to California gasoline, which is shipped into the state by rail car from the Midwest
2  or by ship from outside the United States, and that defendants' trucks are filled directly from rail
3  cars or temporary storage tanks and unloaded into temporary storage tanks before it is blended into
4  refined gasoline.  Nelson Dec. at 2.  From this, defendants deduce that ethanol is in the stream of
5  interstate commerce.  However, defendants have not presented the court with similar evidence
6  suggesting that other products its drivers haul are similarly in the stream of interstate commerce, and
7  ethanol is only one of many products defendants haul.  See Id. at 1.

8  Defendants counter that plaintiffs' showing is itself somewhat sparse, and that by contrast,
9  for example, the plaintiffs in Adams offered more detailed complaint allegations as to the
10 defendants' policy of requiring off-the-clock work, and further supported the allegations with 13
11 declarations and exhibits.  See, e.g., 242 F.R.D. 530 at 537.  However, the court is satisfied that
12 plaintiffs' showing here is sufficient under the lenient standard for conditional certification;
13 plaintiffs have provided some factual basis to support their allegations beyond mere averments in the
14 complaint, and at this first stage of conditional certification, it is inappropriate for the court to
15 entertain an inquiry on the merits.  The fact that such an inquiry will be necessary in the future does
16 not constitute a sufficient ground to prevent putative class members from receiving notice.  The
17 court does not discount the fact that defendants' arguments may prove persuasive upon more
18 extensive discovery and further development of legal arguments; however, at this stage, it does not
19 matter whether all drivers were impacted in the same way or will be eligible for similar relief upon
20 closer scrutiny of the differences in their assignments while employed by defendants.  It may
21 ultimately resolve that some plaintiffs are exempt and others are not, in which case only the latter
22 will be class-eligible.  Other of these questions also go to the merits and are better reached at the
23 later stage of final certification.

25      B.     Arbitration Agreements

26 Defendants contend that some drivers should be excluded from conditional certification
27 because they previously signed arbitration agreements that cover wage and hour disputes, which
28 defendants claim make them ineligible to opt in to this action.  Plaintiffs contend that, as with the

1  Motor Carriers exemption, exclusion of individuals on this basis would constitute engaging in a pre-
2  determination of the merits of a defense at an inappropriate stage of the certification process.  The
3  limited information before the court about the arbitration agreements comes from William Nelson,
4  who states in his declaration that "[a]s part of the new hire process," drivers are "provided" an
5  optional arbitration agreement, along with "a variety of new-hire paperwork."  Nelson Dec. at 3.
6  The agreement has apparently been updated a number of times, and the current version was adopted
7  "in late 2002 or early 2003" and "does not exclude wage and hour claims from arbitration."[6] Id.; id.,
8  Exhs. B and C.  Specifically, the newest version provides examples of the types of claims intended
9  to covered by the agreement and then states that it additionally covers "all other charges related to
10 any aspect of [a driver's] employment with KAG West, LLC."  Id., Exh. C.  Nelson also notes that
11 he believes that "most if not all drivers hired since [the current agreement was adopted] have signed
12 it."  Id.
13     In support of excluding those who have signed arbitration agreements, defendants cite
14 Barnett v. Countrywide Credit Services, Inc., No. 01-1182, 2002 WL 1023161, at *1 (N.D. Tex.
15 May 21, 2002), in which a court in the Northern District of Texas held that although notice should
16 be sent to all employees of the defendant in that case, "only those persons who did not sign
17 arbitration agreements [were allowed to] send back their consent form and opt-in to the suit."  It is
18 not clear, however, from the very brief decision in the Barnett case whether any issues relating to the
19 form, scope, or validity of such agreements had yet been addressed by the Texas court.  In the
20 present case, defendants have not sufficiently developed the record as to the nature of the arbitration
21 agreements at issue, and it is unclear what number of individuals have signed either a current or
22 former version of the agreement or whether the agreements are valid.  The court will reserve its
23 determination as to the validity of the arbitration agreements until after notice has been mailed and
24 those receiving it have had an opportunity to express an interest to join the suit.  If validity of those
25 agreements is in issue the court will resolve the dispute and then, at the second stage of the
26 certification process, any individuals who are shown to have signed valid arbitration agreements that
27 properly pertain to the type of claim at issue may be excluded from the collective suit.
28

10

C.     Opt-In Interest

Defendants ask the court to consider lack of presently demonstrated opt-in interest by current and former drivers in its decision on conditional certification. Defendants, however, do not supply any legal basis to support the idea that plaintiffs must demonstrate any such interest prior to conditional certification and the authorization and mailing of notice; nor is the court aware of any requirement that plaintiffs must do so. As a practical matter it would make little sense to require plaintiffs to have the knowledge they attempt to obtain by gaining approval of notice from the court. Moreover, plaintiffs have in fact supplied the court with sixteen consent forms as of the date of the hearing. See Lawson Supp. Dec.

This court's grant of conditional certification does not guarantee that final certification will be approved at the second stage of review. Defendants will have their opportunity to challenge the status of any ineligible individuals who may opt in, or defendants may challenge the certification generally at the second stage of the two-tiered review process. Furthermore, if notice yields little to no interest, as defendants claim to suspect, they will not be prejudiced. Although only a small number of individuals may ultimately choose to opt in and be determined eligible for recovery, the court deems it appropriate at this first conditional stage of the certification process to allow notice to be sent and then to reassess certifiability after the deadline for filing consent to join has passed.

D.     Improper Solicitation

Defendants assert that the present litigation has been "lawyer-driven" and claim that deposition testimony of the named plaintiff Harvey makes this apparent. Plaintiffs' counsel, however, maintain that drivers of defendants, as well as drivers from at least one other trucking company, in Southern California initiated contact with plaintiffs' counsel of their own accord, and that this contact led, through the course of counsels' reasonable investigation, to the joining of counsel with both of the named plaintiffs to bring this suit.

Defendants liken the facts here to those of a consumer class action, Bodner v. Oreck Direct, LLC, No. 06-4756, 2007 WL 1223777 (N.D. Cal. April 25, 2007) (Patel, J.), in which this court denied class certification on the basis of improper solicitation of a named plaintiff through a

11

newspaper advertisement. However, defendants' counsel's likening of the case at hand to that of Bodner is inapposite. In Bodner, the Long Beach firm Westrup Klick LLP solicited plaintiff Bodner to serve as named plaintiff in an action against Oreck Direct, LLC, for breach of express warranty, unlawful deceit, unlawful concealment, false advertising, and unfair business practice in its marketing and sales of allegedly dysfunctional "air purifiers." Id. at *1. The suit was similar to one Westrup Klick had previously brought against Oreck Direct in another district of the state, which had been dismissed previously, and the firm had a prior history of controversy in its relationships with named plaintiffs in other cases. Id. at *1, *2. There were no indications that any potential plaintiffs had initiated contact with the firm, the named plaintiff was solicited by a newspaper advertisement seeking a plaintiff for a lawsuit for which the complaint had already been drafted. The plaintiff had very little involvement in the proceedings, and the necessary research of the claimed defective product at issue and a theory of liability had already been developed prior to obtaining the consent of the named plaintiff to become part of the suit. Id. at *2–*3. None of these circumstances exists in the present case.

Plaintiffs' counsel Antonio Lawson represented at the parties' most recent case management conference on November 19, 2007, that an individual named Oscar Bell initially contacted him in 2005 on behalf of Bell and other drivers, and that Bell initiated contact with Lawson after independently hearing about a prior lawsuit Lawson brought in Southern California. In response, plaintiffs' counsel state they investigated for two to three months, which included traveling to Southern California on two occasions to meet with Bell and any other drivers that were interested in pursuing a lawsuit, and that they did this prior to filing any suit against defendants.[7] It is unclear who Bell was actually employed by and to what extent he interacted with plaintiffs' counsel, but defendants will have an opportunity to depose Bell in order to determine whether he indeed orchestrated the connection of plaintiffs' counsel and plaintiff Harvey in the manner Lawson has suggested.

Plaintiffs' counsel appear to have experience with suits of this nature but have never represented a client in a suit against defendants in this case. There is no evidence that counsel posted any advertisements or otherwise sought out individuals to sue defendants prior to learning

12

1  information about defendants from Bell and other drivers.  Lawson's account of the sequence of
2  events leading to the filing of the present suit is perfectly plausible, and unless otherwise
3  contradicted, stands on its own.  Defendants will have the opportunity to depose Bell in order to
4  confirm the nature of his communications with plaintiffs' counsel.  However, barring defense
5  counsel discovering any divergent information, this court will not deny conditional certification on
6  the basis of improper solicitation because based on this record the court finds that no improper
7  actions were taken by plaintiffs' counsel.

II. <u>Notice</u>

The FLSA requires that notice to potential plaintiffs be "accurate and timely," so that potential plaintiffs "can make informed decisions about whether to participate." <u>Hoffmann-La Roche II</u>, 493 U.S. at 170.

### A. <u>Contact Information</u>

Plaintiffs contend that defendants have yet to provide necessary contact information for all relevant putative class members to be noticed.  In a supplemental declaration filed on November 7, 2007 plaintiffs' counsel Antonio Lawson claims that a contact list defendants provided in September was inaccurate as to approximately ten percent of the addresses of the drivers listed, which plaintiffs argue has interfered with their ability to communicate with all putative class members and will continue to hamper their efforts to disseminate notice.  Lawson Supp. Decl. at 2.  Defendants maintain that they have provided all contact information to the best of their ability and, at a case management conference conducted on November 19, 2007, defendants' counsel represented that defendants would work with plaintiffs' counsel to remedy any inaccurate information that may previously have been provided plaintiffs.

Some inaccuracies may reasonably remain despite defendants' disclosures as to former employees; however, to the extent that defendants have for any reason withheld any contact information in their possession, the court orders defendants to supply it to plaintiffs within thirty (30) days of the date of this order.

13

### B. Mailing and Posting of Notice

Plaintiffs request that the court order both the mailing of notice to putative class members and the posting of notice at current employees' work locations to ensure that the maximum number of drivers view the notice. In support of this argument, plaintiffs cite the Romero court's determination that although "[f]irst class mail is ordinarily sufficient to notify class members who have been identified," 235 F.R.D. at 492–3, "other methods" of disseminating notice may sometimes be appropriately employed. Id. at 493. Specifically, the court held that where there is some risk that the defendants may fail to provide the contact information of all putative class members—thereby preventing them from receiving the notice they are entitled—posting of notice in addition to direct mailing is preferable. Id. (citing Johnson v. Am. Airlines, Inc., 531 F. Supp 957, 961 (N.D. Tex. 1982)).

Defendants argue the court should decline to order posting in this instance because there is no concern here that the information supplied to plaintiffs as to current employees—the beneficiaries of posted notice—is incorrect or incomplete. And, if it is, they have agreed to work with plaintiffs to remedy any inaccuracies. Defendants contend that in both Adams and Romero, concern about deficient information existed, and therefore, unlike here, posting was necessary in those cases. 242 F.R.D. at 541; 235 F.R.D. at 493. Additionally, defendants refer to prior disputes between counsel for the parties and raise a concern that "posting of notice in the terminals may create an environment which gives rise to further anonymous allegations of misconduct"—that "Plaintiffs may claim that Defendants' managers made statements about the notice, or interfered with the posting, and so on." Def's Opp. 25.

In Adams, this court cited the Romero holding, agreeing with the Romero court that posting of notice where doing so amounts to no more than a small burden can lead to the best notice practicable. 242 F.R.D. at 541-542 (quoting Romero, 235 F.R.D. at 492). However, this court was particularly concerned in Adams that with over "500 locations and several thousand employees . . . the risk of failure to provide contact information for all potential plaintiffs" was high. Id. at 542. However, in this case, the parties have generally agreed that there are likely no more than 1,000 total

1 putative class members and it is clear that most of the contact information that has been provided to
2 plaintiffs is correct or will be corrected prior to the mailing of notice.  Defendants' concerns about
3 posting notice in facilities where some drivers or managers might react to such posting in a hostile
4 manner are ironic.  Since the posting relates to compliance with legal requirements of the labor laws,
5 the employer should be concerned if its managers or other employees react with some degree of
6 hostility   Nonetheless, many of the putative class members appear to be former drivers of
7 defendants who would not even be exposed to notice posted at defendants' terminal sites.
8 Therefore, at the present time, the court will authorize mailing only.

### C. Form of Notice

The Supreme Court stated in Hoffmann-La Roche II that "in exercising the discretionary authority to oversee the notice-giving process, courts must be scrupulous to respect judicial neutrality." 493 U.S. at 174.  "To that end, trial courts must take care to avoid even the appearance of judicial endorsement of the merits of the action." Id.  Notice has the "purpose of providing [potential plaintiffs] with a neutral discussion of the nature of, and their rights in, these consolidated actions." Monroe v. United Air Lines, Inc., 90 F.R.D. 638, 640 (D.C. Ill. 1981).

The court is concerned with ensuring that any notice sent out is clear and understandable.  Defendants have not challenged any particular elements of the proposed notice provided by plaintiffs.  The court does, however, note a few problems, which merit correction.

First, the reference made to the court's neutrality, which now reads as follows,

> Please note that the Court has not ruled on the merits of the lawsuit.  The Court has only ruled that it is important that you be notified of the existence of the lawsuit so that you can determine whether you wish to join.

must be moved and inserted directly beneath the title on the first page of the notice, which reads "Notice of Lawsuit Against Beneto Bulk Transport d/b/a KAG West LLC and Kenan Advantage Group," and the following line, which reads "United States District Court For the Northern District of Californi [sic] A court authorized this notice. This is not a solicitation from a lawyer."[8]  The statement should also be changed to a bold font, and should be re-worded to read as follows:

This notice and its contents have been authorized by the United States District Court Honorable Marilyn Hall Patel District Court Judge. The Court has taken no position in the case regarding the merits of the plaintiffs' claims or defendants' defenses.

Second, in Section 4 of the notice, entitled "The Consequences of Joining This Lawsuit," the second sentence of the second paragraph, which now reads, "If there is no recovery, you will not be required to pay the attorneys for any of their work," should be altered by changing the period at the end of the sentence into a comma and adding the following clause: "though you may be responsible for your proportional share of defendants' costs."

Third, references throughout the document to September 15, 2003 should be changed to May 9, 2004, and it should be made clear in some section of the notice, that although those receiving it may be eligible to join the suit, they may be exempt or ineligible to do so. The alteration in date reflects the court's determination of the tolling period described below. The addition of language speaking to exemption or eligibility is meant to relay to a driver who receives the notice that although he or she may fit the description contained in the notice, the court could find their opt-in invalid at a later date. This accounts for drivers that may have signed a valid arbitration agreement or been subject to the motor carriers exemption during the period at issue. It also accounts for the possibility that the statute of limitations, which, as explained below will presently cover the three-year period prescribed for willful violations of the FLSA, may ultimately be reduced to the exclusion of some drivers if no willful violation is shown.

Finally, neither plaintiffs' counsel's facsimile number nor phone number is currently included with the address in Section 3. These should be added to ensure clarity.

With the exception of the necessary stated changes, the court deems the notice supplied by plaintiffs appropriate in its form and authorizes it to be sent to putative plaintiffs subsequent to the corrections noted being made.

### D. Deadline for Filing Consent to Join

Plaintiffs propose a ninety-day consent to join deadline following mailing of notice, and defendants do not take issue with plaintiffs' request. Therefore, the court approves the ninety-day period.

16

E.      Statute of Limitations

The normal statute of limitations for an FLSA violation claim is two years. See 29 U.S.C. § 255(a). If a violation is willful, the statute of limitations is extended to three years. Id. Willfulness pursuant to 255(a) can be shown with evidence that the "employer either knew or showed reckless disregard [as to] whether its conduct was prohibited by statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 134 (1988).

The court cannot make a determination of willfulness at this early stage. Rather, the court will allow notice to be sent to drivers employed by defendants at any time during the past three years, and opt-ins will be subject to exclusion at the stage of final certification.

F.      Equitable Tolling of Statute of Limitations

Under the FLSA, individual plaintiffs in a collective action must file a valid consent to opt in within the applicable statute of limitations. 29 U.S.C § 256(b); Partlow v. Jewish Orphans' Home of S. Cal., Inc., 645 F.2d 757, 760 (9th Cir. 1981), abrogated on other grounds by Hoffman-La Roche II. Plaintiffs ask the court to equitably toll the statute of limitations in this case, which defendants do not dispute is appropriate. Defendants do, however, ask that the tolling be limited in nature.

Equitable tolling is extended in only limited circumstances where claimants exercise diligence in preserving their legal rights but are unable to opt in within the prescribed statute of limitations period. Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990) (citing Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 151 (1984)). This court has held that tolling should be extended when a defendants' misconduct induces a plaintiff's failure to meet the appropriate limitations deadline. Adams, 242 F.R.D. 530 at 543; See also Irwin, 498 U.S. at 96. As this court has previously stated, although Partlow is not interpreted with uniform scope by district courts, this court has found neither express language nor policy justifications for limiting the principle employed to parties harmed by no fault of their own. See Partlow, 645 F.2d at 760-61. This court has recognized that the Supreme Court suggests equitable tolling is properly applied to cases involving faultless plaintiffs whether placed in peril by timely but defective filings of their own counsel or by defendants' inducement of delay in the proceedings. Irwin, 498 U.S. at 96. Prior applications of

17

1   equitable tolling illustrate that the inquiry should focus on fairness to both parties. See generally id.;
2   Partlow, 645 F.2d at 760–61 (refusing to hold the plaintiffs liable for the actions of their counsel,
3   depriving the plaintiffs of their legal rights due to no fault of their own). The same principle of
4   fairness should rationally inform this court's determination as to the appropriate period for which to
5   toll the limitations period.

6   Plaintiffs assert that this court initially raised the issue of communication with the class at a
7   case management conference on March 5, 2007 when it directed the parties to negotiate a protective
8   order "to permit the production of contact information for the putative class." Plaintiffs contend that
9   the parties never entered into any agreement as to a protective order, nor did defendants timely
10  provide the requested contact information. Moreover, plaintiffs contend they still have not received
11  full and accurate contact information from defendants. See Lawson Supp. Decl. 2.

12  Defendants do not dispute that equitable tolling is appropriate but ask that the court limit
13  tolling in the following two ways: (1) begin tolling thirty days from the date plaintiffs first requested
14  contact information of putative class members by special interrogatories on April 9, 2007, so that
15  tolling would be calculated starting May 9, 2007, and (2) cease tolling on the date that defendants
16  provided contact information, September 24, 2007. Defendants cite this court's determination in
17  Adams that thirty days from the date a plaintiff requests contact information is a reasonable date
18  from which to start tolling, and that tolling appropriately ceases when the defendants supplies the
19  information. 242 F.R.D. 530 at 543.

20  The court will begin tolling thirty days after the date of plaintiffs' interrogatory request on
21  April 9, 2007, therefore beginning tolling May 9, 2007. Although the court addressed the issue of
22  contacting putative class members at the case management conference on March 5, the court merely
23  told the parties to agree to a process for communication with current and former drivers. It was not
24  until plaintiffs served their first interrogatories on April 9 that plaintiffs actually and specifically
25  requested defendants "identify (by name, social security number, last known address and last known
26  number) each and every driver employed by Defendants in California from September 15, 2002 to
27  the present." Lawson Dec. Exh. 1. The court will cease tolling on April 30, 2008. This date
28

18

reasonably allows for a short period of time for counsel to work together to correct any erroneous contact information and send out the approved notice.

CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1) Plaintiffs' motion to conditionally certify a collective class is GRANTED. The collective class of potential plaintiffs consists of all current and former employees of KAG West who have worked as drivers for Beneto Bulk Transport/KAG West LLC and Kenan Advantage Group in California at any time since April 9, 2004, who are not exempt from suing defendants under the FLSA.

2) Plaintiffs' request to authorize mailing and posting of notice is GRANTED in part and DENIED in part. Notice must be mailed to all potential plaintiffs, but no posting is ordered at this time.

3) Defendants must provide to plaintiffs' counsel any supplementary contact information requested by plaintiffs within thirty (30) days of the date of this order.

4) Plaintiffs' request to designate a 90-day deadline for potential plaintiffs' filing of Consent to Join forms is GRANTED. Potential plaintiffs will have ninety (90) days to file their Consent to Join forms.

5) Plaintiffs' request to equitably toll the statute of limitations for this action is GRANTED. The statute of limitations will be tolled beginning May 9, 2007 and ending on April 30, 2008.

6) Plaintiffs' motion to approve their proposed notice is DENIED. Counsel shall confer and submit an amended proposed notice in compliance with this order within thirty (30) days of the date of this order.

IT IS SO ORDERED.

Dated: March 31, 2008

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

19

ENDNOTES

1. The proposed recovery start date has been altered pursuant to this order.

2. All facts are taken from plaintiffs' complaint and motion and defendants' opposition unless otherwise noted.

3. "An action to recover . . . may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).

4. "No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b).

5. The additional declarations—of Antonio Montero, Rodney Drummer, Jose Bran, and Reggie Wilson—were electronically filed by plaintiffs on September 27, 2007 in support of the motion now before the court.  Defendants argue these declarations should be struck because plaintiffs failed to disclose the individual declarants at an earlier appropriate time in violation of Federal Rules of Civil Procedure 26(a), (e), and 37(c)(1).  There is no link, however, between plaintiffs' omission and any particularly damaging result to defendants, and little would be served by striking the declarations because they do no more than echo the named plaintiffs' claims.

6. An earlier version (for which defendants have provided a sample that appears to have been signed by plaintiff Harvey on September 22, 1999) explicitly excluded wage and hour claims from the scope of the agreement, stating, "By law, claims such as those involving worker's compensation, unemployment insurance, and wage and hour pay complaints may not be submitted to arbitration, and therefore are not covered by this agreement."  Nelson Dec., Exh. B.

7. Plaintiff Harvey attended the two meetings held by plaintiffs.  Harvey has relayed that at the first of two meetings Mr. Lawson merely asked questions of the drivers and expressed his belief that the drivers were entitled to overtime pay.  See generally Harvey Depo. at 154-155.  Plaintiff Harvey did not recall any mention of a lawsuit against defendants at the first meeting, and he stated that at the end of the first meeting he did not have a sense that there would be a suit.  Id. at 156:16-157:3.  At the second meeting, Harvey stated Mr. Lawson did express a desire to represent drivers in a suit if any of the drivers were willing to bring the action.  Id. at 160:4-10; 161:5-16.  And, at that time, Harvey agreed to serve as a plaintiff.  Id. at 160:11-15; 161:10-18.  When first asked about who organized the first meeting, plaintiff Harvey stated that plaintiffs' counsel Antonio Lawson did, but he then stated that his belief was based on nothing more than the fact that Mr. Lawson was present.  Id. at 151:15-19.  When asked the question a second time, Harvey stated he did not know who organized the meeting.  Id. at 151:22-152:1.  And, when asked the same question in regard to the second meeting, Harvey again stated he did not know who had been the organizer.  Id. at 157:11-14.  Further, as to the first meeting, when asked who prompted him to attend, Harvey responded that he was invited by other drivers.  Id. at 151:6-7.

8. The misspelling of "California" in the text should also be corrected.